UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JOSE MARGARITO AGUIRRE,

    Petitioner,

v.    Case No: 5:19-cv-565-TPB-PRL

SECRETARY, DEPARTMENT OF
CORRECTIONS and FLORIDA
ATTORNEY GENERAL,

    Respondents.
_____/

**ORDER DENYING THE AMENDED PETITION AND
DISMISSING CASE WITH PREJUDICE**

**I.   Status**

Petitioner, Jose Margarito Aguirre, an inmate of the Florida penal system, initiated this action by filing a pro se Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. 1). He is proceeding on an Amended Petition (Doc. 12). Respondents filed a Response (Doc. 16).[1] The Court provided Petitioner with an opportunity to reply (Doc. 13), but he did not do so. This case is ripe for review.

**II.   Relevant Factual and Procedural History**

The facts are set out in Petitioner's initial brief filed on direct appeal (Resp. Ex. C at 1-6). According to the brief's factual summary, one night, Petitioner and Fernando Castaneda drove in a black Dodge to the Rodeo Bar in Mount Dora (*id.* at

---

[1] Attached to the Response are several exhibits. The Court cites the exhibits as "Resp. Ex."

1-2). Petitioner's friends, Richard Herrera, Cynthia,[2] and Jesse, arrived at the Rodeo Bar at the same time in a separate vehicle. When they all arrived, Herrera had a .40 caliber firearm with him and left it in Jesse's car when they all went into the back room of the bar (*id.*).

Jeremiah Barriner, Kellie Adams, and Demetrius "Michi" Barriner (Jeremiah Barriner's brother) were also in the back room of the bar (*id.*). At closing time, Petitioner and Michi got into an altercation, resulting in Petitioner getting kicked out of the bar (*id.*). At trial, the bar owner testified that when Petitioner was being escorted out of the bar, he made threatening remarks to Michi and Michi's group of friends (*id.* at 2-3). Michi testified at trial that after Petitioner was kicked out of the bar, the bar owner suggested that Michi and his friends wait before exiting the bar because he was concerned about Petitioner's aggressive actions towards them (*id.* at 3). After briefly waiting, Michi, Jeremiah Barriner, and Kellie Adams began walking to their car and when they stopped to converse, the black Dodge approached them and Petitioner, who was in the passenger seat of the Dodge, pointed a gun out the window (*id.*). According to Michi and Kellie Adams, Petitioner then stated, "I have something for you . . ." before firing several gunshots in their direction (*id.*). Two of those shots struck Jeremiah Barriner, killing him.

Cynthia and Herrera testified at trial that they were also in the black Dodge when Petitioner fired the shots. According to them, when they left the bar with Petitioner, someone in Michi's group of friends shouted, "We're going to put

---

[2] In the trial transcript, the witnesses also refer to Cynthia and Cindy (*see* Resp. Ex. B at 603).

[Petitioner] on a T-shirt" (*id.*). Cynthia, Herrera, and Petitioner interpreted that statement as a threat to kill Petitioner (*id.*). According to Cynthia, just before Petitioner began shooting, she saw Michi, who was standing next to Jeremiah Barriner, lift his shirt as someone uttered the threatening statement again (*id.*). Cynthia testified that when Michi lifted his shirt, she believed he was attempting to show that he had a firearm (*id.*). Michi, however, testified that he was unarmed and did not make any threatening statements, nor did he lift his shirt when the black Dodge approached his group (*id.*).

Herrera testified that when he was leaving the bar with Petitioner, Petitioner asked for Herrera's gun and Petitioner took possession of the firearm when he got into the black Dodge (*id.*). According to Herrera, as they drove past Michi's group, Cynthia pointed at the group and said, "There goes the motherf**ker who . . . hit . . . choked me" (*id.*). Herrera stated that Petitioner then said to Michi's group, "I got something for you motherf**kers," before firing three or four shots in the group's direction (*id.*).

Fernando Castaneda, who was driving the black Dodge when Petitioner shot Jeremiah Barriner, testified that after Petitioner fired the shots, he yelled, "Go . . . go . . . go," so Castaneda drove away quickly and ended up at Cynthia's house (*id.* at 4-5). The next morning, Herrera took the firearm to his grandmother's house, where Petitioner's father disassembled the gun, cut it into parts, and discarded it off a roadside in Apopka (*id.*). Petitioner's father subsequently led police to the discarded gun parts (*id.*).

An autopsy of Jeremiah Barriner revealed that he suffered one gunshot wound to his back and one gunshot wound near his ankle (*id.* at 5). At trial, Petitioner claimed he acted in self-defense (*id.*). He testified that he feared for his life when Michi said he would put Petitioner on a T-shirt. According to Petitioner, when Michi lifted his shirt, Petitioner fired at the ground with no intent of shooting anyone (*id.* at 6). Petitioner explained that he fled to Texas after the incident because Jeremiah Barriner's friends began posting online threats against Petitioner (*id.*).

After the state rested its case, trial counsel moved for a judgment of acquittal:

> MR. CARRANZA: Okay. Your Honor, at this point we would move for a judgment of acquittal. We don't believe the State has proven a prima facie case. Specifically, Your Honor, for the second-degree murder, we don't believe that the State has proven a prima facie case of the depraved mind. We believe that with cross-examination and with direct examination it is clear that this incident did not have any evil intent, a depraved mind.
>
> We believe the physical evidence in regard to the trajectory of the bullet and mister -- and the testimony from Cindy Aguirre stating that Mr. Aguirre stated and he physically already showing that he shot to the right and shot to the ground. We believe that the State has proven a prima facie case of manslaughter at this point, but we don't believe it rises to second-degree murder.
>
> THE COURT: Motion is denied.

(Resp. Ex. B at 559-60). Following Petitioner's trial testimony, trial counsel renewed his motion for judgment of acquittal, which the trial court again denied (*id.* at 644).

Following closing arguments, the jury found Petitioner guilty of second degree murder, specifically finding that Petitioner discharged a firearm causing death or great bodily harm during the commission of the offense (Resp. Ex. A at 140). The trial court adjudicated Petitioner as a Prison Releasee Reoffender and sentenced him to a life term of incarceration (*id.* at 183-86).

On direct appeal, Petitioner, with the benefit of counsel, filed an initial brief (Resp. Ex. C) pursuant to *Anders v. California*, 386 U.S. 738 (1967), representing that no good faith argument of reversible error could be made. In the *Anders* brief, however, appellate counsel raised two issues for potential review: (1) whether the trial court erred in denying Petitioner's motion for judgment of acquittal, and (2) whether the trial court erred in denying Petitioner's motion for a mistrial (Resp. Ex. C). Without requiring a response from the state, the Fifth District Court of Appeal per curiam affirmed Petitioner's judgment and conviction without a written opinion (Resp. Exs. D-E).

Petitioner later filed several pro se postconviction motions with the state courts, including a Florida Rule of Criminal Procedure 3.850 motion raising three claims (Resp. Ex. Q). The trial court summarily denied the Rule 3.850 motion (Resp. Ex. T), and the Fifth DCA per curiam affirmed the trial court's decision without a written opinion (Resp. Ex. W). This action followed.

### III. Governing Legal Principles

#### *A. Standard of Review Under AEDPA*

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. *See Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 642 (11th Cir. 2016). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" *Id.* (quoting *Greene v. Fisher*, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. *See Marshall v. Sec'y Fla. Dep't of Corr.*, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. *See Harrington v. Richter*, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"

or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." *Id.* § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* [at 102] (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 18 (2003); *Lockyer*, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); *Williams v. Taylor*, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

*Bishop v. Warden, GDCP*, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

### B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies available for challenging his state conviction. *See* 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in

his federal petition to the state's highest court, either on direct appeal or on collateral review. *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Pope v. Rich*, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that *Boerckel* applies to the state collateral review process as well as the direct appeal process.").

A state prisoner's failure to properly exhaust available state remedies leads to a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. *See, e.g., Coleman*,[3] 111 S. Ct. 2546; *Sykes*,[4] 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. *See, e.g., Walker v. Martin*, 131 S. Ct. 1120, 1127-1128, (2011);

---

[3] *Coleman v. Thompson*, 501 U.S. 722 (1991).

[4] *Wainwright v. Sykes*, 433 U.S. 72 (1977).

> *Beard v. Kindler*, 130 S. Ct. 612, 617-618 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. *See Coleman*, 111 S. Ct. 2546.

*Martinez v. Ryan*, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Even though a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010).

### C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (citing *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), and *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. *Strickland*, 466 U.S. at 687.

Further, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Knowles v.*

*Mirzayance*, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied *Strickland*'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. *Richter*, 562 U.S. at 105. As such, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." *Id.* (citing *Richter*, 562 U.S. at 105); *see also Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1333-35 (11th Cir. 2013); *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004).

IV. Analysis

### *A. Ground One*

Petitioner argues that he is "actually innocent" of second degree murder because there is no evidence that Petitioner acted with "a depraved mind" during the killing (Doc. 12 at 18). In support of this assertion, Petitioner argues that when moving for judgment of acquittal, trial counsel argued that the evidence did not support this element of the crime and, to that end, he appears to claim the trial

court's denial of his motion for judgment of acquittal violated his due process rights under the Fourteenth Amendment[5] (*id.*).

Petitioner exhausted this claim when he, through appellate counsel, raised this claim as a possible appellate issue in his *Anders* brief on direct appeal.[6] The Fifth DCA found this claim lacked merit and per curiam affirmed Petitioner's judgment and conviction without a written opinion (Resp. Ex. D). Thus, the Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications.

When reviewing an insufficiency of the evidence claim in a habeas petition, a federal court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S.

---

[5] The Court notes that a freestanding actual innocence claim is not cognizable on federal habeas review. *See Collins v. Sec'y, Dep't of Corr.*, 809 F. App'x 694, 696 (11th Cir. 2020). But considering the substance of Petitioner's allegations, the Court construes this issue as a claim that the trial court erred in denying Petitioner's motion for judgment of acquittal. In any event, Petitioner's claim that he is "actually innocent" because he committed the lesser included offense of manslaughter instead of second degree murder does not demonstrate innocence and is without merit.

[6] Petitioner appears to maintain that this claim is unexhausted because appellate counsel raised the claim in an *Anders* brief and thus the appellate court did not consider the issue on the merits (Doc. 12 at 18). He also explains that he then raised this claim in his Rule 3.850 motion, but the trial court declined to address the merits of the claim because it was not cognizable on collateral review (*id.*). Petitioner seemingly tries to overcome any procedural bar by arguing that this Court's failure to consider the claim will result in a "manifest injustice" (*id.*). But Respondents do not argue that this claim is unexhausted. And the Court notes the Eleventh Circuit has found that an adjudication of a claim presented in an *Anders* brief can satisfy the exhaustion requirement. *See Jenkins v. Bullard*, 210 F. App'x 895, 898 (11th Cir. 2006). This is so, because the *Anders* procedure requires an appellate attorney to note possible appellate issues in the *Anders* brief and the appellate court is required to conduct an independent review of the record to determine whether those possible issues are of arguable merit. *Id.* Thus, when an issue is raised in an *Anders* brief, it satisfies the exhaustion requirement under AEDPA. *Id.*; *see also McClain v. Sec'y, Dep't of Corr.*, 855 F. App'x 610, 613 (11th Cir. 2021).

307, 319 (1979). The court must assume that the jury resolved any evidentiary conflicts in favor of the prosecution, and the court must defer to that resolution. *Id.*

Second degree murder is "[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual." § 782.04(2), Fla. Stat. The depraved mind element of second degree murder requires "ill will, hatred, spite, or an evil intent." *Poole v. State*, 30 So. 3d 696, 698 (Fla. 2d DCA 2010). In most cases, this intent must be inferred from the circumstances. *Antoine v. State*, 138 So. 3d 1064, 1074 (Fla. 4th DCA 2014) (quoting *Williams v. State*, 239 So. 2d 127, 130 (Fla. 4th DCA 1970)). To establish that the defendant acted with a depraved mind, the state must present evidence of circumstances showing more than an "impulsive overreaction" to an attack. *Wiley v. State*, 60 So. 3d 588, 591 (Fla. 4th DCA 2011) (citing *Light v. State*, 841 So. 2d 623, 626 (Fla. 2d DCA 2003)); *Dorsey v. State*, 74 So. 3d 521, 522 (Fla. 4th DCA 2011). Also, it is well-settled law in Florida that "[e]ven though a defendant has no intent to hit or kill anyone, firing a gun into a crowd of people constitutes second degree murder" because such acts indicate an indifference to human life and demonstrate ill will. *Pressley v. State*, 395 So. 2d 1175, 1177 (Fla. 3d DCA 1981)(citing *Golding v. State*, 26 Fla. 530, 8 So. 311 (1890); *United States Fidelity & Guaranty Co. v. Perez*, 384 So.2d 904 (Fla. 3d DCA 1980).

Here, the state presented evidence that as soon as Petitioner left the bar, he asked for the firearm and then shot several times into a group of people, killing

Jeremiah Barriner. Although at trial Petitioner argued that he fired in self-defense because he thought Michi was brandishing a gun, whether Petitioner acted in self-defense was a factual issue properly presented to the jury. As such, upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim is neither contrary to nor an unreasonable application of federal law, and it is not based on an unreasonable determination of the facts given the evidence presented to the state court. Ground One is denied.

## B. Ground Two

Petitioner argues that his trial counsel was ineffective for failing to investigate Jeremiah Barriner's past propensity for violence (Doc. 1 at 19). Petitioner raised this claim in his Rule 3.850 motion (Resp. Ex. Q at 10). The trial court summarily denied the claim, finding as follows:

> Evidence of the victim's reputation is admissible to disclose his or her propensity for violence and the likelihood that the victim was the aggressor, the notion being that reputation evidence demonstrates the product of what is generally discussed in the community. *Antoine v. State*, 138 So. 3d 1064 (Fla. Dist. Ct. App. 2014). Such reputation testimony is admissible in a self-defense case as circumstantial evidence to prove the victim's conduct, that at the crucial time the victim acted consistently with his reputation for violence. *Id.* However, Defendant did not claim that Victim was the aggressor; instead he argues that Mr. Bannister was the aggressor. During Defendant's testimony in court, he alleges he had no issues with either [sic] Victim or Jeremiah Barriner in the past. Defendant knew of the individuals from the community, however, had not had any prior altercations or controversies; not even an exchange of words prior to the night of June 6th, 2015. Raising past traits of violence by the victim who was not the aggressor would have been

>   incorrect during trial. Accordingly, the motion is denied as
>   to count two.

(Resp. Ex. T at 4-5) (record citations omitted). The Fifth DCA affirmed the trial court's summary denial without a written opinion (Resp. Ex. W).

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, the Court defers to the state court's finding that Petitioner never claimed that the victim, Jeremiah Barriner, was the aggressor, but argued at trial that he acted in self-defense because he believed Michi was in possession of a firearm. Thus, evidence of the victim's propensity for violence would have been irrelevant to Petitioner's claim of self-defense. Under the deferential standard of AEDPA review, the state court's adjudication of this claim was neither contrary to nor an unreasonable application of *Strickland*, and it was not based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d). Ground Two is denied.

Accordingly, it is

**ORDERED AND ADJUDGED**:

1. The Amended Petition (Doc. 12) is **DENIED** and this case is **DISMISSED with prejudice**.

2. The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close this case.

3. If Petitioner appeals this Order, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability

is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[7]

**DONE AND ORDERED** at Tampa, Florida, this 6th day of February, 2023.

_____
TOM BARBER
UNITED STATES DISTRICT JUDGE

Jax-7

C: Jose Margarito Aguirre, #U39112
    Counsel of record

---

[7] The Court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.